William M. SMITH, as President and on behalf of the New York Metro Area Postal Union, APWU, AFL–CIO and Dennis O'Neil, Plaintiffs,

v.

John E. POTTER, Postmaster General of the United States, Defendant.

No. 01 CIV. 9512(JFK).

United States District Court, S.D. New York.

Nov. 9, 2001.

Opinion in Full, Nov. 15, 2001.

Lewis, Greenwald, Clifton & Nikolaidis, P.C., New York City (Louie Nikolaidis, Peter Henner, of counsel), for Plaintiffs.

Mary Jo White, United States Attorney for the Southern District of New York, New York City (Daniel S. Alter, Sheila M. Gowan, Assistant United, States Attorneys, of counsel), for Defendant.

*ORDER*

KEENAN, District Judge.

The application for a preliminary injunction is denied in so far as shutting down the Morgan Facility is concerned. Plaintiffs have failed to meet the higher standard necessary for the issuance of such a mandatory injunction. They have not demonstrated that there is a likelihood of irreparable harm of their prevailing in the litigation, Moreover, the balance of hardships tips decidedly in favor of the defendant.

However, the Court directs that the James A. Farley Station, which is adjacent to the Morgan Facility and connected to it by tunnel, be tested for the presence of anthrax. Such tests have already been concluded at Morgan, the Ansonia Station, Times Square Station, Rockefeller Center Station and Radio City Station. The Court sees no reason not to test James A. Farley Station, The testing as James A. Farley should begin immediately and the Government is directed to inform the Court and plaintiffs' counsel of the results of such tests as soon as they are completed.

A full Opinion and Order with Findings of Fact and Conclusions of Law will be issued in the near future.

Should any emergency arise at the Morgan Facility or should the status quo change, the Government is directed to notify the Court immediately.

**SO ORDERED.**

*OPINION and ORDER*

### *Background*

This is an application for a preliminary injunction under 42 U.S.C. § 6972, the Resource Conservation And Recovery Act ("RCRA"). Plaintiffs seek mandatory injunctive relief to compel the United States Postal Service ("USPS") to shut-down and decontaminate the Morgan Processing and Distribution Center ("Morgan"), to test the James A. Farley postal facility ("JAF"), and to test all "downstream" postal facilities that are serviced by Morgan.

By order of November 9, 2001, this Court denied the application to shut down Morgan, but directed that JAF be tested immediately. In that order, I stated that a full Opinion would follow and this is that Opinion.

Plaintiffs seek this relief because in October 2001 anthrax testing revealed the presence of anthrax spores on five pieces of mail-sorting equipment on the third floor in the south building of the Morgan Facility. Morgan is a building complex located between 28th and 30th Streets and 9th and 10th Avenues on the westside of Manhattan. The south building runs from 28th to 29th Streets and has six work floors plus office space on the top floors. (Tr. 65).[1]

Anthrax is a virulent infectious disease caused by the bacterium "bacillus anthracus." (Tr. 148). The bacillus can be carried in spores existing in powder form and can cause death. The anthrax contamination at Morgan likely came from anthrax-

---

1. Tr. refers to the Transcript of the evidentiary hearing that commenced on November 6, 2001.

laced letters that were sent to Tom Brokaw at NBC News and The New York Post, which were processed at the Morgan Facility. Morgan is the largest central mail-processing facility in the New York City area and JAF is adjacent to Morgan and connected to it by tunnel.

### Standard For A Mandatory Preliminary Injunction

To obtain a preliminary injunction, a party seeking such relief must establish that: (1) the injunction is necessary to prevent irreparable harm, and (2) either (a) a likelihood of success on the merits, or (b) a sufficiently serious question going to the merits of the claim as to make it fair ground for litigation, and that a balance of the hardships tips decidedly in favor of the moving party. *See Malkentzos v. DeBuono,* 102 F.3d 50, 54 (2d Cir.1996). Where an injunction is mandatory, *i.e.,* its terms would alter, rather than preserve, the status quo by requiring some positive act, *see Tom Doherty Assocs. Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 34 (2d Cir.1995), the moving party must meet a higher standard than ordinarily required by "clearly" showing that he is entitled to the relief sought, or that "extreme or very serious damage" will result from a denial of the injunction. *Phillip v. Fairfield Univ.,* 118 F.3d 131, 133 (2d Cir.1997). *See also Brewer v. West Irondequoit Cent. Sch. Dist.,* 212 F.3d 738, 743–44 (2d Cir.2000); *Wilson v. Amoco,* 989 F.Supp. 1159, 1171 (D.Wy.1998). In this case, both sides agree that a mandatory injunction is at issue relative to the closing of the Morgan Facility.

### Findings of Fact

An evidentiary hearing was conducted on November 6, 7, 8 and 9, 2001, at which six witnesses testified for the plaintiffs and four witnesses for the USPS. For plaintiffs were William Smith, William Bachmann, Dennis O'Neil, Eckardt Johanning, M.D., Edward Olmsted and Jeanne Mager Stellman, PhD. Stephen Ostroff, M.D., David Solomon, Robert Daruk and Tom Cash testified for the defense.

Events of September 11, 2001 and thereafter recall a similar situation in our history. September 11, 2001, like December 7, 1941, "is a date that will live in infamy," and as we have learned since the 11th there is real concern amongst us for safety. Adding to our worries are the recent bioterrorist attacks involving anthrax-contaminated letters sent through the Nation's mail system. Tragically, four Americans have died from anthrax poisoning since September 11th and several others have become ill from it. Postal workers and others who handle our mail understandably are afraid. But what we cannot allow is for that fear to grow into unreasoned panic. For what we have to fear now, more than anything else, is panic. As President George W. Bush said in his speech to the Nation on November 8, 2001: "We will not give in to exaggerated fears or passing rumors. We will rely on good judgment and good, old common sense."

Life necessarily entails risks and the risk here is minimal compared to the harm that would be caused by shutting down the Morgan Facility. Morgan processes "over 13 million pieces of mail a day," according to Robert Daruk, its plant manager, (Tr. 450), and is the largest industrial facility in Manhattan. (Tr. 446).

The Court finds that the USPS has taken appropriate remedial measures to diminish any safety risk created by the presence of anthrax at the Morgan Facility. The USPS has properly responded to the presence of anthrax spores on the third floor in the Morgan Facility. Once anthrax was found in the mails, the USPS sought direction from the Centers for Dis-

ease Control and Prevention ("CDC"), a branch of the United States Department of Health and Human Services, as to the appropriate precautionary actions needed to protect the health and well-being of USPS employees and to reduce the risk of infection. (Tr. 383, 422–23). As a result, the USPS provided postal workers with gloves and face masks, (Tr. 515), along with instructional safety talks. (Tr. 463–65). When contaminated mail appeared in New York, the USPS tested for anthrax in areas of those New York facilities through which the tainted letters passed. (Tr. 488–89). In addition, the USPS conducted anthrax testing of employees who worked on the processing and delivery routes along which the contaminated letters traveled. (Tr. 433–34). When anthrax spores were found on the third floor of Morgan, the USPS closed-down the affected area, again consulted with the CDC, and retained environmental clean-up specialists to clean 120,000 square feet of space. (Tr. 416–17). In consultation with the CDC, the USPS has provided and is now providing over 7000 postal workers in New York City with antibiotics that will prevent them from contracting anthrax while the affected area in the Morgan Facility is cleaned. (Tr. 439–40). This includes workers at Morgan.

From a public-health perspective, Dr. Stephen Ostroff, the Chief Epidemiologist in the Infectious Disease Center at the CDC, took the lead role in the investigation of the anthrax-tainted letters mailed to various New York media outlets. At the evidentiary hearing, Dr. Ostroff testified that, based on the scientific information available regarding these mailings (*i.e.*, development of disease, time frames, etc.), the amount of anthrax "tracked through" Morgan does not "continue to pose an ongoing public health risk." (Tr. 154). Dr. Ostroff stated that if the postal workers were at risk of anthrax from processing the letters, such illness would have occurred during the time period immediately after the letters passed through the Morgan Facility, which was in mid-September. (Tr. 153–55). Because, among other factors, no New York postal worker contracted the disease during the five-week period before the CDC started its investigation of the Morgan-mail trail,[2] Dr. Ostroff concluded that the present risk to New York postal workers is "very, very low." (Tr. 157). Although Dr. Stellman disagreed in part with Dr. Ostroff, the Court accepts and credits the Ostroff testimony because he is the infectious disease specialist.

Thanks to the remedial actions employed, the continued operation of the Morgan Facility currently poses no imminent and substantial risk to health or the environment. Prudence required testing of JAF and the court on November 9, 2001 ordered such testing.

During the evidentiary hearing, postal officials agreed to implement the Court's directions as to how to better guarantee the safety of postal employees at Morgan. These instructions included relocating the glove and mask distribution site to the employee entrance, so this way workers will not have to traipse through the facility before obtaining protective gear. (Tr. 515–16). Also, the Court instructed the USPS to post an advisory at each employee time-clock station regarding the availability of prophylactic antibiotic treatment. (Tr. 441).

**2.** Officials did not become aware of the initial case of anthrax in New York till on or about October 12, 2001. (Tr. 150).

Mr. William Bachmann, an electronic technician at Morgan, (Tr. 53), testified about an extensive mice-infestation problem at the Morgan Facility. (Tr. 88). This rodent condition was acknowledged by Robert Daruk, a career postal executive who is the senior plant manager at Morgan. (Tr. at 449, 519). Although there is no concrete evidence that rodents transmit anthrax, (Tr. 179, 335, 369–70), it is obvious that such a condition is not pleasant and does not add to the physical well-being of those in the workplace. The Court recognizes that on Thanksgiving day, November 22, 2001, there is no mail delivery, therefore, this seems like an appropriate date to exterminate the Morgan Facility to once and for all eradicate the rodent-infestation problem. Accordingly, I direct that extermination services be utilized on this day to rid the Morgan Facility of the mice problem.

### Conclusions of Law

The CDC is the federal agency responsible for protecting the public health of the country by providing leadership and direction in the prevention and control of diseases. *See Mazur v. Merck & Co.*, 964 F.2d 1348, 1350 n. 1 (3d Cir.1992). As the D.C. Circuit has advised: "It is not the court's role to second-guess scientific judgments of" a governmental agency that is responsible for protecting public health. *American Mining Congress v. EPA*, 907 F.2d 1179, 1187 (D.C.Cir.1990). Indeed, the CDC is the type of public medical health agency to which courts should defer. *See Tolman v. Doe*, 988 F.Supp. 582, 586 (E.D.Va.1997). The CDC is entitled to deference, but not an abdication of judicial responsibility. *See American Mining Congress*, 907 F.2d at 1187. Here, the CDC has studied and examined the situation and the status of the anthrax contamination at Morgan and, therefore, has met "its obligation to engage in reasoned deci-

sionmaking." *Id.* The CDC has reached the conclusion that there is no need to close Morgan. This, as the court said in *Christie–Spencer Corp. v. Hausman Realty Co., Inc.*, 118 F.Supp.2d 408, 421, 422, "is powerfully persuasive to the Court of the lack of any need for judicial interference." I do not have the medical knowledge or expertise to become a Monday morning quarterback here. The CDC is complying with its responsibilities under the law. So long as it does so the courts should not butt in and I decline to do so.

### A. *RCRA*

Plaintiffs seek a preliminary injunction against the USPS under 42 U.S.C. § 6972(a)(1)(B), the citizen-suit provision of RCRA, alleging that the USPS' response to the anthrax contamination has created an imminent and substantial danger to the public health and the environment. Congress has waived the federal government's sovereign immunity for purposes of citizen suits under RCRA by providing that a suit can be brought against any person, including the United States. *See* 42 U.S.C. § 6972(a)(1)(B). Therefore, sovereign immunity does not preclude the plaintiffs from bringing a citizen suit under RCRA against the Postal Service, a federal agency.

RCRA is a comprehensive environmental statute designed to prevent the disposal of solid and hazardous wastes in ways that are harmful to the public health or the environment. *See* 42 U.S.C. § 6902(a). To that end, RCRA regulates the generation, handling, treatment, storage, transportation, and disposal of solid and hazardous wastes. *See* 42 U.S.C. §§ 6922–25. By enacting a citizen-suit provision under RCRA, Congress sought to increase enforcement of this legislation by authorizing affected citizens to bring suit against any RCRA offender whose solid waste han-

dling practices may pose "an imminent and substantial endangerment to health or to the environment." 42 U.S.C. § 6972(a)(1)(B). *See also Connecticut Costal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1316 (2d Cir. 1993).

■ Despite the broad scope of the imminent-hazard citizen suit, a court must be cautious when considering the propriety of preliminary injunction relief under this provision. *See Wilson v. Amoco Corp.*, 989 F.Supp. 1159, 1172 (D.Wyo.1998). Indeed, an imminent and substantial danger for purposes of a RCRA claim does not exist "if the risk of harm is remote in time, speculative in nature, and de minimis in degree." *Id.* According to the CDC, the anthrax contamination at Morgan does not pose a danger to employees or the community because, by mid-October, any danger had dissipated due to the passage of time. Also, the CDC found significant the fact that, thankfully, no postal worker in New York has fallen ill due to anthrax exposure. Therefore, this Court, defers to the CDC and, concludes that because the USPS implemented the CDC's recommended actions, including providing prophylactic antibiotic treatment, issuing protective gear to workers and sanitizing the affected areas, USPS' response to the anthrax contamination poses no imminent and substantial danger to the public or the environment.

The USPS argues that because anthrax does not constitute "a solid waste" under RCRA, that Act does not apply here. The Court, however, sees no need to decide this issue in view of the fact that there is no imminent and substantial danger present.

### B.  *Public Nuisance Cause of Action*

In its opposition papers, the USPS argues that sovereign immunity bars the Plaintiffs' public nuisance cause of action. The public nuisance claim centers on allegations that "actions and omissions of the USPS with respect to the handling of anthrax have created a public nuisance because of the potential exposure of the general public to a deadly bacteria" Comp. at ¶ 84. The USPS argues that the Court should consider this theory relative to the injunction, even though the plaintiffs have not urged it on the injunction aspect of the case.

Congress has waived the Postal Services' sovereign immunity by providing that the Postal Service may "sue or be sued." 39 U.S.C. § 401(1). But the scope of the waiver under Section 401(1) is limited with respect to tort claims. Specifically, Section 409(c) limits the Section 401(1) waiver by providing, in essence, that any tort claim against the Postal Service is subject to the remedies and restrictions of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671 *et seq. See* 39 U.S.C. § 409(c) ("[The FTCA] shall apply to tort claims arising out of the activities of the Postal Services."); *see also Pereira v. United States Postal Serv.*, 964 F.2d 873, 876 (9th Cir.1992); *Active Fire Sprinkler Corp. v. United States Postal Serv.*, 811 F.2d 747, 753 (2d Cir.1987).

■ Money damages are the only form of relief permitted under the FTCA. *See Birnbaum v. United States*, 588 F.2d 319, 335 (2d Cir.1978); *Rufu v. United States*, 876 F.Supp. 400, 406 (E.D.N.Y. 1994). Accordingly, Congress has not waived the government's sovereign immunity for tort claims, like the plaintiffs' public nuisance claim, that seek injunctive relief against the USPS. As such, the circumstances here mean that injunctive relief is not appropriate based on a public nuisance theory.

The application for a preliminary injunction is denied, but the Court directs that on November 26, 2001 by 1:00 P.M., I and the plaintiffs' counsel be supplied with a detailed report from the Government as to the then-existing status of the anthrax condition at Morgan as well as the clean-up. Should the status quo change between now and November 26, 2001, the Court is to be advised immediately.

A status conference is set for December 7, 2001 at 10:00 A.M.

**SO ORDERED.**